

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| IN RE THE ESTATE OF | ) | |
| PATRICIA MCDOW, DECEDENT, | ) | |
| GRAY BIRDSONG, | ) | |
| | ) | |
| Appellant, | ) | **WD86824** |
| | ) | |
| V. | ) | **OPINION FILED:** |
| | ) | **DECEMBER 17, 2024** |
| THE CALLAWAY BANK, | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Cole County, Missouri**
The Honorable Daniel Green, Judge

Before Division Three: Mark D. Pfeiffer, Presiding Judge, Gary D. Witt, Judge and
Thomas N. Chapman, Judge

The Estate of Patricia McDow ("Estate"), appeals a judgment from the Circuit Court of Cole County, Missouri ("trial court"), denying the Estate's petition for discovery of assets against the Callaway Bank ("Bank"). The Estate raises two points on appeal and argues the trial court erred because: 1) the trial court erroneously applied the law in that the two certificates of deposit ("CDs") at issue were automatically renewed and, as such, there was no final maturity date so they could not have been presumed paid; and 2) the judgment was against the weight of the evidence. Finding no error, we affirm the judgment of the trial court.

**Factual and Procedural Background**

Patricia McDow ("Decedent") was married to Robert McDow, and they lived next door to Gray Birdsong. Birdsong frequently helped the McDows over the years. After Mr. McDow's death in 2001, Birdsong continued to help and take care of Decedent. Mr. McDow was married before he met Decedent, and he rented a safe deposit box at the Bank with his former wife. After his former wife passed away, Decedent and Mr. McDow were married. Mr. McDow never added Decedent as a co-renter of the safe deposit box, and thus she had no way to access the box's contents after his death without a court order.

At some point after Mr. McDow's death, Decedent told Birdsong that there was a safe deposit box at the Bank, but she did not know what was in it. In 2014, Decedent passed away and Birdsong was listed as the personal representative of her estate. Birdsong obtained a court order to access the safe deposit box in 2016.

Birdsong found two original CDs in the safe deposit box: Certificate of Deposit No. ****7 ("CD 1"), issued on February 7, 1981, in the face amount of $10,000 bearing interest at 13.985% per year, and Certificate of Deposit No. ****1 ("CD 2"), issued on October 1, 1981, in the face amount of $10,000 bearing interest at 15.182% per year. The stated interest on each of the CDs was to be paid by check, and each CD recited that the Bank would have the right to change the interest rate upon renewal giving thirty days' notice. The CDs were for six-month terms and were to renew automatically for

subsequent six-month terms until the CDs were redeemed.[1]  Both CDs were issued to Mr. McDow and his former wife as joint tenants with rights of survivorship.  On the back of each CD was an endorsement from Mr. McDow to himself and to Decedent on October 21, 1998.  Prior to Birdsong accessing the safe deposit box in 2016, the box was last opened in 1998.

Upon locating these CDs, Birdsong requested the Bank to make payments on each CD.  The Bank did not make the payments.  Ultimately, Birdsong, acting as the personal representative of the Estate, filed a petition praying for the court to direct the Bank to deliver possession of the funds and all unpaid interest corresponding to the two CDs.  A bench trial was held.

The evidence established that, as the personal representative of the Estate, Birdsong obtained a court order to open the safe deposit box and found the two original CDs.  The CDs were not marked in any way to show that they had been paid.[2]  Birdsong did not find any documents from the Bank at Decedent's home that indicated it was going to raise or lower the interest rate on the CDs.  Birdsong believed Decedent was competent and aware of her financial assets leading up to her death.  Birdsong did not know the details regarding Decedent's finances during her life and had no information about any payments she may have received from the Bank.  The only information Birdsong had

---

[1] Both parties interchangeably use the words "redeemed" and "canceled" throughout their arguments.  For purposes of this opinion, both words are synonymous and refer to the payment of the balance of a CD to its holder.
[2] The Estate asserts that if the CDs had not been previously redeemed, which was its position, at the time of the hearing CD 1 would have a value including interest of $2,921,999.75 and CD 2 would have a value including interest of $4,668,520.84.

regarding the alleged non-payment of the CDs was the fact that the original documents were found in the safe deposit box and they were not marked as paid.

The Bank's records indicate that from 2005-2012, Decedent held a series of CDs different from the ones at issue in the total amount of $20,000 issued by the Bank, and that she continued to invest a smaller amount of money into new CDs until her death in 2014. Birdsong was unaware of these CDs and did not know how Decedent would have had the funds to add to her deposits with the Bank because she was living on a fixed income from social security since Mr. McDow's death. Additionally, the Bank presented its ledger from March 30, 2006, showing that the $10,000 corpus of CD 2 was deposited into the McDows' bank account. Birdsong had no knowledge of this deposit.

K.B.,[3] the President and Chief Executive Officer of the Bank, testified that the Bank changed from paper CDs to electronic book entry CDs in the late 1990s because clients struggled with maintaining possession of the physical CDs. Prior to that, when the Bank issued paper CDs, they were a triplicate form: the top copy was green and would be given to the client; the second copy was yellow and would be retained by the Bank to go in the physical file; and the third copy was pink and would be used as an activating ticket to run through the processing system that actually made the CD become effective. K.B. described the process and each employee's role when activating a paper CD: a banker would work with the client and fill out the terms of the paper CD including the principal amount, the interest rate, whether the interest would be compounded, sent by

---

[3] Pursuant to section 509.520 RSMo. (2023), we do not include the names of witnesses other than parties.

4

check, or deposited into the customer's account, along with the CD's term; a different employee in the data processing department would input the details of the transaction into the Bank's computer system; a bookkeeper would compile the new CD's information into the Bank's certificate of deposit reference journal, which included all active CDs; and finally, a quality control person would verify all of the Bank's records and make sure it matched the CD's terms. The Bank would send notices to clients about paid interest, the maturity or renewal of a certificate, and any change in the interest rate. In addition to the Bank's internal checks and balance system in place when creating CDs, the Bank's records and procedures are also externally reviewed during audits.

When a client presented a paper CD for redemption, the Bank's procedure was as follows: the Bank would ascertain whether the person had authority to execute the instrument; once it was confirmed the person had authority, the Bank would notify the client of the available options which included reinvesting or depositing the money in a specific account; the Bank would mark the original paper CD as paid, keep it, and pull the yellow copy from the Bank's file so it was no longer referenced as active; and finally the Bank would input a line-item entry that showed the CD was redeemed and where the funds were paid. Any redeemed CD would be listed on that month's report of canceled CDs, and the CD would also be removed from the certificate of deposit reference journal. If a client lost the original CD, the Bank would most often have the client complete an affidavit swearing the original document was lost, and then the Bank would follow its normal CD redemption procedures. The Bank maintained all records of CDs while they

5

were active, but once a CD was redeemed, the Bank "typically" followed a seven-year retention policy, after which the records were destroyed.

The Bank's documents related to the CDs at issue included the Bank's certificate of deposit reference journal for January 2005. CD 2 is reflected in the report, indicating that it was an active CD at the time; the report did not list CD 1. The Bank also located a monthly recap of CDs that were redeemed, which included CD 2 and showed it was redeemed on March 30, 2006. In addition, the Bank presented a document that reported interest payments for CD 2 from 2002-2006, but there were no interest payments for CD 1 during this time period. K.B. testified that all of the Bank's documents for CD 2 were consistent with those produced when a CD was redeemed.

The Bank could not locate any similar records for CD 1 as it "had been long past the seven-year retention period." Given the fact the certificate of deposit reference journal from January 2005 showed that CD 2 was still active but did not show CD 1, and no interest was shown to be paid on CD 1 during this time period, K.B. concluded CD 1 had been redeemed prior to that time.

It was typical for the McDows to redeem or renew their oldest CDs, and K.B. believed it was likely the funds from CD 1 and CD 2 were reinvested by Decedent into newer CDs with the Bank. K.B. testified that the McDows never alleged the Bank had retained funds from their CDs, and they never made a demand that the CDs had not been paid. Further, K.B. testified that it is impossible for a CD to be accidentally absorbed by the Bank and removed from its records. Six or more of the Bank's employees would need

6

to be acting together in an attempt to fraudulently pay funds on a CD due to internal checks and balances.

The Bank also presented an expert witness who testified about the Bank's CD procedures and the general practices within the banking industry. The witness testified that banks are required to send notices prior to the maturity of a CD informing clients what the renewal interest rate would be. If a paper CD were in a safe deposit box in someone else's name, such as the case here, the owner of the CD would not have access to the document unless they had a right to access the box. Even the Bank would not be able to access the paper CD itself unless it had the right to access the box. It was generally the practice among banks, during the period when paper CDs were in use, to have a client complete an affidavit if the client lost the original paper CD, and then the client could still redeem the lost CD.

After reviewing the Bank's documents regarding CD 2, the expert witness found the documents to be consistent with those produced when a CD was redeemed. The witness was familiar with the Bank's policies and procedures and believed the Bank followed the best business practices with respect to the maintenance and production of its documents associated with redeemed CDs. Further, the expert witness testified it would be impossible for a CD to be accidentally removed from the Bank's reference journal. Likewise, it would be highly unlikely for a CD to be accidentally listed as canceled if it in fact had not been redeemed due to the Bank's internal checks-and-balances process. While banks can maintain records longer then prescribed, which is normally five years, the expert witness stated there is no reason for a bank to do so. Since there were no

records that showed an item entry payment of CD 1 into the McDows' checking account, CD 1 was not listed on the January 2005 reference journal, and the tax notices for 2002-2006 did not show any interest was being paid for CD 1 (even though interest was being paid for CD 2), the witness concluded that CD 1 was no longer active.

The trial court issued its findings of fact, conclusions of law, and judgment denying the Estate's petition for discovery of assets. The trial court found the Bank introduced evidence including the January 2005 certificate of deposit reference journal, certificate of deposit system records, and item entry records that showed the payment of CD 2 by the Bank and deposited in Decedent's account on March 30, 2006. While the Bank did not have similar direct evidence regarding CD 1, the trial court found the presence of CD 2 throughout the Bank's documents and the absence of CD 1 was indicative of the fact CD 1 had been previously redeemed. Moreover, the trial court found that the absence of records for CD 1 established it was paid prior to January 1, 2005, because the Bank's "banking, auditing, reporting, and quality control practices would not have been able to cause the removal of [CD 1] from the bank's records without payment." The trial court found the Estate offered no evidence contradicting the Bank's practices or authenticity of its records, and further noted that Birdsong testified he had no knowledge of Decedent's income prior to her death. The judgment also concluded, "[a]fter twenty years from the maturity of a note, a rebuttable common law presumption arises that the debt has been paid (regardless of the effect of any statute of limitations). *Carpenter v. Kendrick*, 252 S.W. [6]46 (Mo. 1923); *Williams v. Mitchell*, 20 S.W. 647 (Mo. 1892)." As such, the trial court held each CD's maturity date was over forty years

8

ago, and therefore each was presumed paid, and the Estate failed to rebut this presumption. Moreover, regardless of this rebuttable presumption the trial court found the Bank's evidence to be credible and that the weight of the evidence established that the Bank paid the interest and principal due for CD 1 prior to January 1, 2005, and paid the interest and principal due for CD 2 on March 30, 2006, to Decedent. This appeal follows.

## Standard of Review

"On review of a court-tried case, an appellate court will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Ivie v. Smith*, 439 S.W.3d 189, 198-99 (Mo. banc 2014) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). This Court views the evidence and all reasonable inferences in the light most favorable to the trial court's judgment. *Stevenson v. Maxwell*, 605 S.W.3d 1, 5 (Mo. App. W.D. 2020). "We will affirm the judgment if it is correct under any reasonable theory supported by the evidence." *Id.*

## Analysis

The Estate raises two points on appeal and argues the trial court erred in entering a judgment declaring the two CDs were paid because: 1) the trial court erroneously applied the law because the CDs at issue automatically renewed so as to set a new maturity date so they had never finally matured and thus could not be presumed paid; and 2) the judgment is against the weight of the evidence. We address the Estate's second point relied on as it is dispositive.

9

"A judgment is against the weight of the evidence only if the trial court could not have reasonably found, from the evidence at trial, the existence of a fact that is necessary to sustain the judgment." *Meseberg v. Meseberg*, 580 S.W.3d 59, 65 (Mo. App. W.D. 2019) (internal quotation omitted). "The against-the-weight-of-the-evidence standard serves only as a check on a circuit court's potential abuse of power in weighing the evidence, and an appellate court will reverse only in rare cases, when it has a firm belief that the decree or judgment is wrong." *Id.* (quoting *Ivie*, 439 S.W.3d at 206). The framework for an against-the-weight-of-the-evidence challenge on appeal involves four distinct analytical steps:

> (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
> (2) identify all of the favorable evidence in the record supporting the existence of that proposition;
> (3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and,
> (4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Id.* at 66 (citing *Houston v. Crider*, 317 S.W.3d 178, 187 (Mo. App. S.D. 2010)).

The Estate asserts the evidence presented to the trial court does not support a finding that the two CDs were paid. Pertaining to CD 2, the Estate asserts that while the trial court found this CD was paid because of the Bank's documents, K.B. testified that the Bank only kept client records for seven years. The Estate highlights the Bank's retention policy as being in direct conflict with the Bank's implementation of the policy given the fact the Bank retained some client records that were nearly seventeen years old.

10

The Estate also makes much of the fact neither CD was marked as "PAID." As for CD 1, the Estate emphasizes the lack of records for this CD and criticizes the trial court's conclusion that this CD was redeemed prior to CD 2, arguing that to resolve this conflict, "the trial court must have allowed for [the Bank] to simultaneously always and not always follow its redemption and records-destruction policy." We find the trial court's judgment is not against the weight of the evidence.

Beginning with CD 2, there was direct evidence presented to the trial court that this CD was redeemed on March 30, 2006. The Bank presented a document titled "Monthly Certificates Cancelled" which reflected all CDs canceled within the prescribed timeframe, and the document showed CD 2 as canceled on March 30, 2006. Additionally, the Bank presented evidence that the $10,000 corpus from CD 2 was deposited directly into the McDows' bank account. K.B. and the Bank's expert witness testified that it was impossible for a CD to be erroneously marked as "cancelled" due to the Bank's rigorous checks-and-balances system. Further, more than six of the Bank's employees would need to act together in order to fraudulently pay funds on a CD. Since the original CD 2 was found in the safe deposit box, there was no way for Decedent or the Bank to access it, without court intervention, following Mr. McDow's death in 2001. Thus the lack of a "PAID" notation on the CD is not dispositive because the Bank had a procedure in place for clients to redeem a CD even without the original document. The Estate argues that the Bank "always destroyed records after 7 years" and that the Bank "has never said it makes exceptions to its 7 years records destruction policy" that would allow for the presentation of records seventeen years later. However, K.B. only testified

11

that the Bank "typically" followed a seven-year retention-of-records policy. While the evidence regarding the Bank's records retention policy was in conflict with its implementation of the policy, the trial court was in the best position to resolve these conflicts. *See Wilson v. Trusley*, 624 S.W.3d 385, 402 (Mo. App. W.D. 2021) ("We defer [to the circuit court] on credibility determinations when reviewing an against-the-weight-of-the-evidence challenge because the circuit court is in a better position to weigh the contested and conflicting evidence in the context of the whole case.") (internal quotation omitted). We find the trial court did not err in concluding based on the evidence that CD 2 was redeemed on March 30, 2006.

As for CD 1, there was evidence presented that Decedent typically redeemed the oldest CDs and reinvested the proceeds into new CDs from 2005 through 2014. There was no direct evidence of payment of CD 1; however, the trial court found the evidence supported a finding that CD 1 was redeemed prior to January 2005. We agree.

The evidence presented was as follows: CD 1 was not listed on the certificate of deposit reference journal for January 1, 2005, even though CD 2 was active; tax reporting evidence showed no interest being paid by the Bank to Decedent from 2002-2006 for CD 1 even though interest was being paid on CD 2; and the Bank's records never showed the existence of CD 1 after 2005, even though there were records to show Decedent's purchase and redemption of other CDs until the year of her death. The lack of a notation of "PAID" on the original CD 1 is not dispositive because the evidence established there was no way for Decedent or the Bank to access it without a court order, as the CD was placed in Mr. McDow's safe deposit box. Furthermore, the trial court was in the best

12

position to resolve any conflict among the evidence regarding the Bank's seven-year retention policy and the fact the Bank was able to locate some seventeen-year-old documents related to CD 2.

The Estate argues that "[t]here was no probative value to extract from a lack of evidence that [CD 1] wasn't paid, and to say otherwise was to engage in the prohibited practice of rank speculation as to whether one who bears the burden of affirmative proof met that burden[,]" and relies on *Estell v. Estate of Iden*, 714 S.W.2d 774, 776 (Mo. App. E.D. 1986). The Estate asserts, "this Court in *Estell* demanded affirmative proof of payment, not the drawing of negative inferences from the lack of evidence that it was paid." It is of note that in *Estell* the respondent, who pled the affirmative defense of payment, produced **no evidence** to support its defense. *Id.* at 776. Contrary to the respondent in *Estell*, here the Bank produced evidence to support its defense that the CDs were paid. The Bank presented the January 2005 certificate of deposit reference journal, tax reports from 2002-2006, and Bank records showing Decedent's purchase and redemption of other CDs to support its assertion that CD 1 had been previously redeemed. Additionally, the Bank presented evidence that Decedent typically redeemed and reinvested her oldest CDs into new CDs. Moreover, K.B. and the expert witness testified about the types of documents that were produced and maintained for all active CDs.

Thus, the trial court's conclusion that CD 1 had been previously redeemed is supported by the Bank's evidence and the reasonable inferences therefrom. If CD 1 were still active, as the Estate alleges, it would be listed on each of the documents the Bank

13

produced.  Specifically, the certificate of deposit reference journal listed all active CDs and therefore would have listed CD 1, and any interest payments on CD 1 would be reflected in the tax reports, but it was not.  Thus, the Bank's presentation of these records, which do not reflect CD 1's existence, coupled with the witness testimonies support the trial court's finding that CD 1 had been previously redeemed.  The burden of proving the affirmative defense of payment was on the Bank, and ultimately the trial court held the Bank met its burden.  *Id.* at 776 ("In a suit on a promissory note [like a certificate of deposit], a defendant-maker who pleads the affirmative defense of payment has the burden of establishing it.").  We find the trial court's judgment is not against the weight of the evidence.  Point two denied.

## Conclusion

We affirm the judgment of the trial court.

_____
Gary D. Witt, Judge

All concur

14